We will hear argument this morning in Case No. 19-422, Collins v. Mnuchin, and the Consolidated Case. Mr. Mupang? Mr. Chief Justice, and may it please the Court, in the Third Amendment, FHFA, acting as conservator of Fannie and Freddie, renegotiated the enterprise's financial obligations to Treasury. By replacing the enterprise's multibillion-dollar dividend and fee obligations with a variable dividend tied to their net worth, the conservator eliminated any risk that a cycle could continue where the enterprise's obligations to Treasury would themselves cause draws from Treasury's capital commitment. The shareholder's statutory and constitutional challenges to the Third Amendment fail for many reasons, but there are three key defects that I'll try to address today. First, both claims are barred by the Recovery Act Succession Clause, which transfers to the conservator the authority to decide whether shareholders may bring derivative suits on behalf of the enterprises. The type of shareholder injury alleged here, that the corporation's assets have been unlawfully dissipated to a particular shareholder, is plainly derivative rather than direct. The shareholders have not cited even a single case to the contrary. Second, the statutory claim is barred by the Recovery Act Anti-Injunction Clause, which prevents courts from restraining exercises of the conservator's powers or functions. The conservator acted well within its authority in deciding that the renegotiation of the enterprise's financial obligations may have been appropriate to preserve and conserve Treasury's capital commitment. The shareholders cannot second-guess the wisdom or motives behind that business judgment. Third, the constitutional claim fails because President Obama had unrestricted power to remove, and thus to supervise, both of the officials who signed the Third Amendment. Treasury Secretary Geithner was, of course, removable at will, and so too was acting FHFA Director DeMarco. Thus, while the statutory restriction on the President's power to remove the FHFA Director is invalid, it had no prejudicial effect on the Third Amendment. I welcome the Court's questions. Counsel, you say that the common stockholders' claims can't survive because they're derivative, really claims of the corporation, and then barred by the Succession Clause. But it seems to me that they're a little different. According to the claims, anyway, their stock value, their stock was completely wiped out in a unique way compared to the other holders of interests in the enterprises. In other words, that this action was directed at them as distinct from the corporation as a whole, therefore is not derivative, they claim, and shouldn't be barred. What is your answer to that? As we say in our reply brief, we cite the cases from the Delaware Supreme Court and from Judges Orrick, Easterbrook, and Foesner, all of whom recognize that when corporate assets are dissipated, that's a derivative claim, even where the recipient is a shareholder, such that the financial… Excuse me, but when you have different categories of shareholders, or people with financial interests, and the complaint is that the one class was particularly targeted, it does seem to me that that class has a unique claim that can't be characterized as just a claim of the corporation. Well, Your Honor, I think that there's no reason to differentiate between a dissipation of corporate assets pursuant to a dividend payment versus a dissipation of corporate assets pursuant to a side transaction. In the cases that we cite in our reply brief, each of those cases involves certain shareholders being treated better than other shareholders, and it shouldn't make any difference for purposes of a derivative claim whether that special treatment occurs pursuant to a side transaction or through a dividend payment. Well, maybe shareholders being treated differently, but when the way you're being treated differently is that you're completely wiped out. I mean, the corporation doesn't have any particular interest in the balance, it seems to me, at least not the same sort of interest as the shareholders who are left out in the cold. Well, I think the harm here is in the first instance to the corporation. The claim is that the corporate assets have been dissipated, so the corporation does have an injury. And I guess one way of making the point I've been trying to make is I think the shareholders would have the exact same objection if Fannie and Freddie had entered into a contract with the Treasury Department where they bought a commemorative coin from the Treasury Department and paid them for that, all of their net worth in perpetuity. That would be exactly like the claims that we cited in our reply brief where you had a side transaction to one shareholder to the disadvantage of all the other shareholders. And there's just no difference for purposes of a derivative claim whether the harm to the certain shareholders comes because of a side transaction or pursuant to an amendment to the dividend obligation. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Well, counsel, perhaps this is redundant, but give us another example of what direct would look like rather than derivative. So, direct claims are claims where the injury to the shareholder doesn't turn on a harm to the corporation. So, for example, if shareholders are injured in their right to vote, that doesn't implicate the rights of the corporation. It is a direct shareholder claim. And the cases that have recognized direct suits where shareholders are harmed tend to be in those sort of contexts where there's a dilution of, for example, voting power. That's what the Delaware Supreme Court laid out in its El Paso case. Mere harm to shareholders because the corporate assets have been dissipated is a derivative claim. Harms to the shareholders' ability to do things that don't turn on a harm to the corporation first, those are direct claims. Well, what if you had, and I know this agreement doesn't say this directly, but an agreement that simply transferred directly all dividends from existing shareholders, say, to Treasury? That it explicitly said that, would that be, I think it's rather odd that the shareholders' dividends can be jeopardized or depleted. And that's not a direct claim, but the right to vote on corporate matters is a direct claim. So, what if it was more explicit? What would you say to that? So, I think that would be different. I think the difference is it's not a question of being explicit versus implicit. In your hypothetical, they are acting directly on the shareholders' contractual rights to dividends. That doesn't harm the corporation at all. Maybe one way of thinking about it is it's the difference between the size of the pie and the share of the pie. The claim here is that the corporate assets have been dissipated. That is a question about the size of the pie, and that is a harm to the corporation. In your hypothetical, what has been changed is the share of the pie. There's been a direct action on the shareholders' rights to dividends that's been transferred to another shareholder. But importantly, that's not what's going on here. It might be the effect. Whenever the corporation has less assets, that's going to affect shareholders' ability to get dividends. No matter why the corporation's assets have been wasted or stolen. And Judge Posner's opinion in the Seventh Circuit lays this out pretty clearly, that when you have a harm to the corporate assets, it just doesn't matter why the assets have been dissipated, whether it's by theft or a conflict of interest or a side transaction. In all events, the harm is in the first instance to the corporation, not to the shareholders. Thank you. Justice Breyer? Thank you. I think in reading this, you could, with trying to simplify as much as possible, view the shareholders' claim as saying, we bought into this corporation. It was supposed to be private, as well as having a public side. And then the government nationalized it. That's what they did. If you look at their giving the net worth to Treasury, it's nationalizing the company. Now, whatever conservators do and receivers do, they don't nationalize companies. And when they nationalized this company, naturally, they paid us nothing and our shares became worthless. And so, what do you say? Well, Your Honor, what the Third Amendment did is it renegotiated the enterprise's financial obligations. The enterprises were saddled with – I know that. But what I wonder is, can you – is it fair to characterize it, not with this more legal language, but just saying, look, they nationalized it. They gave the company away to the Treasury. Who do you think the Treasury is? It's the government of the United States. Right. And what I – We'll really look into this, and you'll discover they didn't get enough money for it. They did it at too cheap a price. They did it – and they paid us nothing. All right. But can I view this as nationalization? No, Your Honor, because – Because what the agreement does is it replaces a $20 billion a year dividend. So, the enterprise is already owed to the federal government $20 billion a year. What the conservator did was say, rather than having – That goes to the reasonableness of the agreement. They say, okay, let's have a trial on that. Do you think it's a very reasonable thing to do? We don't. And the point is the anti-injunction clause doesn't expose the conservators' business judgment to reasonableness review. The question is whether they exceeded their powers. They say nationalization is not the kind of thing conservators and receivers do. And therefore, you can examine it. And when you examine it, you will see how unreasonable it is. Your Honor, what the enterprises did was they renegotiated financial obligations. That is what they did. Whatever label the plaintiffs want to put on it – No, I don't think it's my fault. What the actual power that was exercised here was a renegotiation of financial obligations. That is what conservators do day in and day out. Now, the terms of this renegotiation are fairly unique, but that's because the enterprises were in a fairly unique condition. Most companies don't owe $20 billion a year to the federal government. And so when they switched that and they switched it to ensure that there was no risk to the quarter trillion dollars of capital that Treasury had committed to these enterprises, that is the nature of the agreement here. It is an unusual agreement, but it is still, at the end of the day, it is a renegotiation of financial obligations that is a heartland exercise of conservatorship power. And if the anti-ingestion clause means anything, it means that you don't second guess whether they could have done it a different way, whether it was a bad deal, whether they did it for bad motives. At the end of the day, what they did is they renegotiated financial obligations. Justice Alito? If we agree with you about the removability of an acting director and also agree with you that the only relevant action was one taken by the acting director, would we have any reason to address the question whether the restriction on the removal of a confirmed director is constitutional? Well, yes, Your Honor. The Court of Appeals, in addition to declining to set aside the Third Amendment, did issue a declaratory judgment that prospectively the FHFA removal restriction should be set aside. Petitioners here did file a cert petition where that is the first question presented. We think the Court should confirm that that was a correct holding, that that removal restriction is invalid and shouldn't be applied prospectively. But we do think that it is no basis to set aside the Third Amendment, both because the acting director is, in fact, removable and will. Well, perhaps if it's legally irrelevant, it could be vacated on that basis without reaching the merits of the question. But let me ask you this. What is your response to the argument on the other side that confirmed directors took actions pursuant to the amendment, and therefore we have to consider the status of confirmed directors? Your Honor, I don't think they've actually ever challenged any action enforcing the Third Amendment by confirmed directors. And I don't know what those actions would be since it's ministerial. The Third Amendment requires the dividends. And most, maybe, the only thing I can even think they might be talking about, though I'd be curious what they have to say, is whether to pay the dividends under the Third Amendment in cash or instead in kind through the liquidation preference. That wouldn't do them any good either way, so I'd be surprised if that's what they're challenging. But other than that, I don't know what it would be that they'd be referring to. If we were to reach the issue of the removability of a confirmed director, and if we were to agree with you on that question, what basis do you have for distinguishing between the release that you think is appropriate in this case and the release that was provided in cases like Bowser's seal of law and appointments clause cases where an appointments clause violation was found? So I think the most significant difference is the fact that in this case, the Treasury Secretary was a party to the action that's being challenged. Their constitutional claim is a claim that the agency action was unconstitutionally insulated from presidential supervision. And unlike in all of the cases you just mentioned, here, one of the parties to the contract is the Treasury Secretary, who, of course, is removable at will by the president and is the president's right-hand man. So no one can say that the president didn't have sufficient control over this agreement. And that's why, if the APA's prejudicial error rule means anything, it means you can't set aside a multibillion-dollar agreement on the theory that the president didn't have enough control over it when the president's Treasury Secretary signed it. Thank you. Justice Sotomayor? I just want to make sure that I get the gist of your argument, that I think I have it right. I know you and the shareholders disagree on whether this deal had a reasonable cause, but let's posit a deal that didn't. For no rational reason, the FHFA sold all of Fannie and Freddie's assets in exchange for $1 to itself. It did exactly what Justice Breyer said. It nationalized things. It nationalized the company. Your position is that there is no court review of a decision by the FSH as conservator that could give shareholders the right to challenge their action. So we think, in a hypothetical like that, we don't think the anti-injunction clause would bar a claim that actions were taken that have no objective, rational justification of being taken to preserve and conserve assets. We do think that even that claim would be barred by the succession clause because it would still be a derivative suit. But if the court disagreed with us about the succession clause, we aren't arguing that the anti-injunction clause means that there's no review of anything the conservator does. We are just saying that when the conservator takes actions that may be appropriate and necessary to preserve and conserve assets, there's no second-guessing the business judgment. And I think that's an important point here. All right, counsel, let me just stop you there. If the company is still in existence but owns by the FHA, there is no claim. My colleagues have posited something close to this. But it is the shareholders who have been kicked out for no business reason. I don't see how that's a derivative suit that the succession clause would bar. It's because the shareholder's harm is derivative of the harm to the corporation. The corporation is not losing its profits. The corporation is actually maybe gaining money by not paying out dividends to the shareholders. But it's the shareholders and not the company that's being deprived of profit. I don't think that's right, Your Honor. Their claim is that FHA acted improperly in giving away the assets of the corporation. All right, counsel, I just want to get in one last question. Your argument is that the FHA is unconstitutionally structured given this court's decision in Sheila Law. I see vast differences between the FHA and the CFPB. The FHA's most notable power, and the reason we are here today, is that they can put certain government-affiliated companies under conservatorship. Conservatorships are never thought of, in my experience, as an executive power. It's historically been an adjunct to the judicial power. So why isn't that, and this is not a wide-reaching power that affects many entities. It's one company at a time, essentially, unlike in the CFPB. So why can't we say that this is an exception to Humphrey's estate or Morrison v. Olson? Briefly, counsel. The question is whether it's a significant executive power, and the authority to decide whether to put Fannie and Freddie into conservatorship or receivership, a decision that affects the entire mortgage market, and thus the home equity of every homeowner in this country, is unquestionably a significant executive power. Thank you, counsel. Justice Kagan? Justice Kagan? Sorry. Mr. Bupan, can I take you back to your answers to Justice Alito? If I understood you right, you said that the only final action that's being challenged here is the Third Amendment. So I'm going to repeat his question to you, because I wasn't quite sure I got your answer. If that's the case, that that's the only final action challenged here, what basis would we have to do anything more than issue a declaratory judgment about the validity of that amendment? So I don't think you have it quite right. The plaintiffs in this case did seek a declaratory judgment that the structure of the FHFA was unconstitutional, and the Fifth Circuit granted them that relief, and there is a cert petition that was granted that includes that question. So we do think it would be appropriate for this court to confirm that that aspect of the judgment is correct. I know that they asked for it, but usually if you bring an APA challenge, you have to point to a final agency action that you think is wrong in some sense. And here, the Third Amendment was done by the acting director. If you are right about that, it doesn't raise the removal issues. So what does raise the removal issues? So it's just like Free Enterprise Fund, Your Honor. They're entitled to bring a prospective suit saying that the ongoing regulatory power of the agency over them, even absent a concrete final agency action, they can seek prospective relief against that. Because, of course, the FHFA, as a regulator, has the authority to decide whether these entities will continue to be in conservatorship or not, or whether they could be put into receivership. The shareholders here have the ability to say that that decision should be made only by a regulator that's constitutionally structured. You're saying that that's true even if they're not pointing to any particular actions in the period when there was a confirmed director that they objected to? Well, it's a prospective suit, Your Honor. So their point is that every regulatory decision FHFA makes going forward, including, most obviously, most importantly, whether to keep the entities in conservatorship or receivership. Just like in Free Enterprise Fund, the court allowed a prospective suit even though, by then, the investigation was basically done. The point is that you've got a regulator and a regulated entity, or the shareholders of a regulated entity, can bring a claim to say that that regulator is unconstitutionally structured as a prospective matter. But you are right. Justice Gorsuch? I guess, counsel, I'm a little confused that this declaratory judgment with respect to future actions seems to me like it would be appropriate for hanging on the wall, but not much else. The plaintiffs here have sought a declaratory judgment in aid of further remedies, retroactive remedies that might actually do them some good, and that's the Third Amendment. And I guess I'm a little confused why we wouldn't proceed to hold that the Third Amendment was void from the beginning by virtue of the Appointments Clause problem. That's pretty much what we did in the CIA, as you'll recall, where we vacated the ALJ's decision. Why wouldn't we do the same here? Well, again, because their claim is that the Third Amendment was unconstitutionally inflated from presidential supervision. But that claim is clearly wrong on the merits, because the Third Amendment was signed by the Treasury Secretary. So it's a merits determination then? Yeah, we're not making a standing argument. And then with respect, if it is, then why isn't it? It's a harmless error argument, as I understand it, but we don't do harmless error in structural constitutional cases, typically. And if we did, isn't it rather speculative to say what would have happened here if we would have had a different director who was actually subject to presidential oversight and the political process, especially when Congress insulated this person, in theory, from that process? Isn't that a degree of speculation that's quite beyond us? I don't think it's speculative at all, Your Honor, because, again, this isn't a decision just by the FHFA director. It was signed by the Treasury Secretary. I understand that point, but if Congress decided to put this person separate from the political process for a reason and might have been to insulate them all from the blowback that might come, who knows? I don't know. You don't know. None of us knows, and isn't that the whole point? And what do we do, again, just to return to my fundamental question, is why isn't this void? When we have the Federal Vacancies Reform Act, for example, says that an action taken by somebody who's without power is void, not just voidable, not ratifiable. It is void. Why wouldn't the same be true here? So, in addition to my point about the Secretary of the Treasury, I guess I would say even from the other side of the coin, this was done by an acting director, and an acting director is also removable at will by the Congress. I understand that argument. Put that argument aside. Put that argument aside and your harmless error argument aside. Why wouldn't this be void? Your Honor, if you reject all the arguments we've made, then I suppose we would probably lose. Okay. All right. So, I got it. It's a harmless error argument on the one hand, and I've got it. Okay. Those are your two arguments. That's it. After that, it's void. Well, in addition to our antecedent arguments about the succession clause, but I want to focus on the merits. Correct. I got that. But when we come to remedies, it's either the acting director is reportable to the President or it's harmless error. I've got it. Thank you, counsel. Justice Kavanaugh? Thank you, Chief Justice, and good morning. You were saying something there. Why don't you continue on? Yes. I would like to talk a little bit about the acting director point because I think it is an important point, and it avoids some of Justice Gorsuch's concerns about the Treasury Secretary's side. The statute does not expressly provide that the acting director is subject to the same cost protections as the confirmed director, and this court should not read a statute to create constitutional problems. It normally reads statutes to avoid constitutional problems. So, an easy solution that avoids all the concerns about structural error and speculation and all the rest is to simply say that under this statute, the acting director, who is the official who took this decision on behalf of FHFA, is, in fact, removable at will by the President, and so there's no problem to begin with. Okay. Is that true of all acting officials? You know, I'd have to look at any given statute to tell you the answer, Your Honor. Well, I guess, is it true, is your principle that you're asserting there that acting officials are presumptively removable at will by the President, unless the statute, with respect to the acting director or acting official himself or herself, specifically puts restrictions on the removability? Yes. Our general position is that you should not leapfrog from any cause restriction for a confirmed official and assume that that extends to an acting official. You would have to always look at the provisions that govern the acting official and see whether there's a removal restriction for them, both as a matter of constitutional avoidance and as a matter of the short-lived clear statement requirement and as a matter of simple common sense. You know, Congress might have very good reasons for why it wouldn't impose a removal restriction on an acting official than it did for a confirmed official, namely that the Senate has actually confirmed the person, so then at that point they might be willing to give them tenure protection. But someone that has never gone through the gauntlet of Senate confirmation, Congress might well be unwilling to provide them with tenure protection. So both as a matter of text and common sense and structural constitutional provisions and constitutional avoidance, you shouldn't read the statute to create a constitutional problem, let alone to set aside a multibillion-dollar contract. Those are good points. I guess the one point that's in tension with that is that Congress also designated it an independent agency, and if the official, even though acting, running it is removable at will, the agency is no longer independent. I'll make two points about that, Your Honor. The first is that Congress often designates agencies as an independent establishment, even when they're concededly not subject to any cause restrictions at all. The best example of that I can give you is if you look at Swan v. Clinton. The agency there was described as independent, but an earlier iteration of that agency was removable expressly at will by the president. The second point I would make is that the fact that the agency is independent, even if that says something about cause restrictions, it's one thing to say that they're independent when they've got a confirmed director. It doesn't necessarily mean that they're independent when they have an acting director, and we know that for this statute itself, because if you look at this statute, before the first confirmed director, there was a transitional period, and the head of the FHFA during that transitional period was an officer in HUD who was not subject to any cause restriction. Justice Barrett? Mr. Mouton, let's say that we agree with you that the Third Amendment was entered into by an acting director who was removable at will by the president, and so the entry into the Third Amendment, let's say, was valid. There was no constitutional problem with it. Let's say that we also agree with you that there was a problem with the confirmed director because he was removable only for cause, and so the confirmed director was administering the Third Amendment, administering the conservatorship and passing along all the earnings from the GICs into the Treasury. Would that create a structural problem? Because even though perhaps the Third Amendment at its inception was valid, could the administering of the Third Amendment by an unconstitutional executive official contaminate it with structural errors such that the whole Third Amendment would have to be set aside? I don't think so, Your Honor, because, again, there's not some discretionary decision within the Third Amendment other than perhaps whether the dividends that are owed are paid in cash or instead paid as a liquidation preference, neither of which would do the plaintiffs here any good, and that's not the claim that they're bringing. Their claim isn't that the Third Amendment is valid, but the money should all be paid in liquidation preferences. Their claim is that the Third Amendment itself should be set aside. So who decides when the Third Amendment, when this arrangement should come to an end, if ever? Because Treasury viewed it as winding down the GSEs, winding down their assets, although it's been characterized not as a receivership but as a conservatorship. Could the confirmed director have said, okay, listen, now this is no longer serving to make the GSE solvent, and so it's time to shift arrangements? Did the confirmed director have that authority under the Third Amendment? So, yes, just like the Second Amendment and the First Amendment and everything else that the agency does, right? That's why we think that they're entitled to relief prospectively, that the FHA director should be removable as well, and then if the FHA director wants to change any of these agreements and can get Treasury free, they can. But let me just ask you this. If the confirmed director could have taken that action at some point in the past, why isn't that an injury? It's just not a problem with the Third Amendment any different than everything else, right? That is essentially a challenge to agency inaction, the failure to amend the contract. On that theory, all of the agreements would have to go, not just the Third Amendment, the Second Amendment, the First Amendment, the original amendment. Fannie and Freddie would have to lose all of the money Treasury has ever given them and all of the capital that has backstopped them. That's not the claim they've brought, and it would be disastrous. Let me just ask you one last quick question. This is shifting gears to the distinction between direct and derivative suits. I'm having a hard time understanding why that corporate law distinction matters in this APA claim, why we can import those concepts from corporate law into the APA, because it seems to me that the shareholders have Article III standing. They suffered a pocketbook injury. You haven't contended, I don't think, that they're not within the zone of interest of the statute, and the APA gives a direct cause of action for someone aggrieved by agency action. So why do we even care about the derivative distinction? Briefly, counsel? The APA doesn't displace traditional corporate law. It incorporates it, and that's why in the 70-year history of the APA, plaintiffs haven't been able to cite a single case that has allowed a shareholder to bring what would otherwise be a derivative suit. Do you have a minute to wrap up, counsel? The Third Amendment should not be set aside. If the APA's prejudicial error rule means anything at all, courts cannot set aside a multibillion-dollar contract on the ground that it was unconstitutionally insulated from presidential supervision, even though both of the officials who signed it were removable at will by the president. If the Recovery Act's anti-injunction clause means anything at all, courts cannot set aside a conservator's renegotiation of complex financial obligations by second-guessing the conservator's statutory exercise of business judgment. And in all events, the Recovery Act's succession clause bars both claims. No case in the history of the APA or American corporation law appears to allow a shareholder to claim direct rather than derivative entry merely because the corporation's assets allegedly were dissipated unlawfully to another shareholder. Accordingly, this Court should reject the challenges to the Third Amendment but uphold the determination that the FHFA Director's removal restriction is unconstitutional yet severable. Thank you, counsel. Mr. Nielsen? Mr. Chief Justice, and may it please the Court, there is a very easy way to answer the constitutional question in this case. The Court should hold that unless Congress says so in a statute, an Acting Director does not have tenure, full stop. I agree with the Solicitor General on this in all respects but one. Because an Acting Director is removable at will, this part of the case should be over. As the United States explained below, plaintiffs do not, in fact, challenge ongoing action by the FHFA. That, rather than the government's latest position, is correct. I urge the Court to read JA 117. There is no reference to any prospective suit or anything like that in the complaint here. If the Court chooses to tackle the harder questions, it should still reverse. First, for the reasons this Court gave in the sale of law, the FHFA does not wield significant executive power because it does not regulate purely private actors. Even the Department of Justice concedes that conservatorship is not an exercise of executive power. By itself, this is another reason to reverse. Regardless, neither party undermines state of the law's observation that the FHFA isn't in the same league as the CFPB when it comes to liberty. Second, the Court should focus on the actual text of the statute, which the parties essentially ignore. Neither party meaningfully disputes that for cause provides the weakest protection in removal law and can easily be read to allow removal based on policy disagreement with the President. The parties say that even that is unconstitutional, but their argument makes a hash out of the Take Care Clause, and it would also have far-reaching consequences. Under their logic, the Social Security Administration, the Office of Special Counsel, the Federal Reserve, the Civil Service will all be subject to constitutional attack, and that's just the beginning. Neither party offers this Court a coherent mind. I welcome the Court's questions. Thank you, Counsel. I'd like to get your take on the question a number of my colleagues have been asking. I agree with you that the acting director is constitutional because it's removable at will, and he enters into the Third Amendment. But the Third Amendment provides for payments in an ongoing way, and including payments under a regular director who is not constitutionally appointed. How does that work? What are the consequences, particularly for the payments that take place under the jurisdiction of the unconstitutionally appointed director? I agree with the Solicitor General's answer on this point. The Third Amendment is not ongoing agency action. It is a discrete thing. It is a contract. And that is what is challenged. That's the decision of the Haynes majority of the Fifth Circuit en banc decision. That is the discrete thing being challenged. There is not ongoing discretion that might affect the interests of the plaintiffs here. It's a contract, and that contract is what governs. Well, there were contracts before the Third Amendment, too, and they were significantly altered. But I guess my question is, what if the complaining stockholders here, you know, confirmed one and said, we want you to get out of this agreement because it's unfair to us. And the director said no. That would be action by the regular director, and certainly it would seem to me could be challengeable given that unconstitutionality. Well, I guess two points, Your Honor. First, nothing like that is in the complaint. There's no complaint about this tank theory. So, you know, this is all hypothetical. But beyond that, this is an ordinary agency action where you could, like, file a petition for rulemaking or something like that. It's a contract. And sure, the parties can renegotiate the contract, but it takes two to tango, and it's not just a decision of the FHSA. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, usually when you have an agency action, it's an enforcement action or something that affects a particular party. Here you're talking about a major change in an entity in which the party, the plaintiffs, are invested. Now, they do, I know you want to keep us at the sort of the initial stage of Amendment 3 or the Third Amendment, but there are, as Justice Barrett noted, what about the administration of it now? It's still in existence. It affects them. And what about the future administration that will have a continuing effect? This is unlike other agency actions. So how do you address that? Well, first I would, again, point the court to the actual complaint here. It's on page J. It's at 117 is the relevant count. And there's no ongoing tank theory here. So all of this is hypothetical. But, again, this is a contract. And with a contract, sure, you might be unhappy with it, but it was entered into it by a conservator who wasn't even exercising executive power, and the FHFA as regulator can't just undo a contract. It takes a decision from the FHFA and the Treasury Department. So the mere fact that it was fortuitous enough for an acting director to do this insulates it from life, from challenge. With respect, Your Honor, I don't think it's this side that is relying on a fluke. The idea that the acting – that the foreclosed provision has anything whatsoever to do with the Third Amendment is entirely implausible. And that's why none of the other complaints or counts that raise this in other courts even raise this as an issue because it just didn't have anything to do with it. Thank you. Justice Breyer? Thank you. As probably you know, in the structural cases like Peekaboo and the others, I dissented very well. What is your advice to me? Should I, in a sense, throw in the towel? Should I stick to my prior dissent? Should I say this is different because, and of course I'm particularly interested in what follows the because. What would you do? Well, this is different because the thing that is being challenged here, leaving aside the acting point, is an act of a conservator. And that isn't even executive power. The Department of Justice, which is about the most vigorous defender of presidential power on earth, concedes that this is not executive power. So that's one way to distinguish this entire issue. This doesn't raise any of those types of issues in this case. Well, what is it? It's not part of the Article III judiciary. No, Your Honor. It's not part of the Article I legislature. And what does that leave? It leaves Article II. Well, no, Your Honor. The court has not been clear if it's private power or simply non-sovereign power. My gut says it's non-sovereign power because it's an agency that's doing this. But if a private person can do it, the government can do it too. And that doesn't take executive power to get there. No different than, you know, ordering books or anything like that, that the court does. That doesn't make ordering books a judicial power. It's just something that government can do to function. Thank you. Justice Alito. We have said many times that structural provisions of the Constitution, like the Appointments Clause and rules about the removal of executive officers, are ultimately important because they affect ordinary people. They affect liberty, as you just mentioned. They affect democratic accountability. The argument against your position here includes the proposition that the way in which the agency carries out its responsibility as conservator has a profound effect on the housing market, and therefore a profound effect on ordinary people. What's your answer to that? The court needs to decide what type of power conservatorship is. And once you know the answer to that, then the logic all falls into place. Conservatorship is not executive power. There are things that have vast significance for the economy that are not executive power. I pointed the court to the Bank of the United States, which surely was even more consequential than this, but it wasn't executive power because banking was not understood as executive power. So too here, essentially, being a conservator for a government insurer is not executive power. It's just outside of Article II, even though it has significant effects on the economy. Thank you. Justice Sotomayor. Counsel, the FHFA is, as a director, an executive appointment. They presumably have executive decision-making, but it seems to be that you're trying to say that we should not be looking at the agency as an executive agency, but we should see whether the power that they're wielding in individual situations is executive or not. Am I getting your argument correct? Mostly correct. I think that you could look at the type of power for a broader range of things. So if we're talking about the agency as regulator, you would look at the agency. I think one of my colleagues asked this. If the FHFA is not an executive agency, what is it? Put aside the conservatorship part of it, is it or is it not an executive agency? Yes. The FHFA is an executive agency in that it has a regulatory function, too. All right. So if it's an executive agency, then I think we do have to look at the constitutionality of its structure. And if we have to do that, how do we get to a subdivision of whether an individual act it did was executive or not? Difficulty separating the concepts. Well, I would point the court. If we're looking at the powers as regulator, they are not significant executive power. They exist, but Congress has essentially given the FHFA a recipe book. This is what you're supposed to do. It's almost binary, and that easily allows for cause to control the exercise of this power because it doesn't have the sort of discretion that the CFPB did. That's actually the point I was raising with the government earlier, but I still see that as a different argument. So if the shareholders have argued that the directors for cause removal is a structural error, that has to do with Justice Alito's question and Justice Gorsuch's earlier questioning of the government. If they're correct, do we have discretion against enjoining the Third Act? How do we get from a structural error to a harmless error? What do we consider to do that? In which situations are we permitted to do that? Well, it certainly would be the case when you're talking about conservatorship. I know that isn't exactly the question, but here if we're talking about a discreet act, which is the thing that they have challenged, and that act did not require any executive power whatsoever, it's hard for me to see how you can get into the question of is it harmless error. There was no constitutional violation at the threshold. Thank you, counsel. Justice Tagan? Mr. Nielsen, you just said that the FHFA is not a very important agency, doesn't have very many powers, but I don't think it has all the powers that both the majority and the dissent referred to in SELA law. I mean, there's not much that those two opinions agreed on, but this seems to be one of them, that the FHFA makes rules, it conducts enforcement actions, it has subpoena power. Even the dissent, again, in SELA law says, I'm quoting here, the FHFA plays a crucial role in overseeing the mortgage market on which millions of Americans annually rely. So how can you say this? Again, my answer to this would be I understand all of that. I think you're always going with the majority, and the majority says that it's not a lot of power. But your point is well taken, and I think the way that you reconcile the dissent and the majority is, the dissent is saying, look how much effect it has in the real world, and the majority is saying, but look at how much power it actually exercises. The difference between this agency and the CSPB is the CSPB has vast discretion, whereas if you go through the statute here, it's true they can do certain things, but only in a very, very limited way. Congress has essentially said, here is the instruction manual, go forth and do it. And for something as reticulated as that, if the agency doesn't do it correctly, the president can say that's cause. That's the easiest type of cause there is. You're supposed to have a report. I don't have a report. You're out the door. But you're suggesting that there's a difference between just saying for cause and saying inefficiency, neglect, or malfeasance. But where do we get that? I mean, once again, the majority said we don't want to really parse the language that way, and the dissenters assumed that these were essentially coterminous restrictions. Well, the easiest way to look at this is if these are companion agencies and Congress uses one language in Dodd-Frank and the other language in the Recovery Act, we ordinarily assume they mean different things. And for all the reasons that Dean Manning explains in his article, Kent Barnett explains in his article, the ordinary meaning of for cause, at least with constitutional avoidance, allows that type of removal. Thank you, Mr. Nielsen. Justice Gorsuch. Good morning, Mr. Nielsen. A lot of your remedial argument seems to hinge on the happenstance that we had an acting director at the time of the Third Amendment's adoption. I'd like to highlight two potential difficulties with that and ask for your thoughts. The first is the assumption that the acting director is answerable to the president while the director is not. Under the statutes creating this outfit, the director appoints deputy directors, the director, not the president. It appears that those deputy directors would be insulated from the president, therefore. And when the director steps aside, he names the acting director, or rather he gives a pool of three of his deputies, and the president chooses which of those three. But the director appointed all three of them. So I'm not sure in what sense or where we get the inference or how we generate from some penumbra emanating somewhere that the president has the removal power over this acting director. That's one. And two is let's spot you that. Let's assume that's the case. So what? The plaintiffs here challenged actions during this whole period, including after a period in which the acting director disappeared, and we now have a director. You say, well, that doesn't matter because the amendment is a thing that was adopted by the acting director. But the plaintiffs are challenging the director's actions as void because he is unanswerable to the president. So why wouldn't we at least be able to provide relief, avoiding the director's actions once we had a Senate-confirmed director in 2014? Well, that's a lot to answer. I'll do my best. As to the acting point, the premise of the other side's argument is that the Vacancies Act doesn't apply. I don't see the basis for that. That's not consistent with how courts have read it in analogous circumstances. But even beyond that, merely because assuming that the president could only pick among those three, that says nothing about whether the president can remove them. Ordinarily, the power to designate includes the power to undesignate, and here the statute says nothing whatsoever to prevent the ordinary operation of that background principle. As to the so what, I would point the court again to JA-117, which is the actual complaint here. There isn't this ongoing theory that we're challenging future actions. All they were challenging was the Third Amendment. You can maybe make an argument that the Third Amendment should be undone or something like that, but that's not even pleaded. And the idea that agency inaction or merely defending something that was constitutional when done becomes unconstitutional really has no limiting principle. Thank you, Counsel. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Nielsen. Is there anything more you wanted to say in response to Justice Gorsuch? Yeah, I would also like to talk about the acting point a little bit more. One of the arguments that the other side makes is that the president could use the acting to try to get away from ever having Senate confirmation. And there's two reasons why that isn't so. One is Congress has many tools to try to stop presidential shenanigans like that. But more than that, there is an appointments clause backstop to all of this. The head of an agency is supposed to be a Senate-confirmed officer. You can have temporary non-Senate-confirmed officers heading an agency, but the appointments clause is a firm backstop against that kind of chicanery that the plaintiffs posit. In your opening, you mentioned a slippery slope argument that if this agency structure was unconstitutional, then so too would be the Social Security Administration and the Office of Special Counsel, which are also headed by single directors. And I think the Solicitor General agrees on that. But then you went on to name multi-member agencies and the federal and civil service. And my understanding of the principle that would be applicable here would be that single-director independent agencies are not historically rooted, as the court said, and that's all we would be saying and applying here. So in my brief, I make the point, what do you do with the chair of the Federal Reserve, which is separately nominated, separately confirmed, and has his or her own statutory duties? That's not controlled by a multi-member entity. He or she has their own duties under law. I have a theory for why that is unconstitutional. I don't think that power is significant. I also don't think you should start inferring removal protections. But under their theory, why would that be constitutional? How could that be constitutional? Likewise, for the civil service, in federal law, the court says, we're not going to recognize an exception for inferior officers that make real policy-making powers, or we haven't recognized one yet. Well, if that's the case, all a plaintiff has to do is throw on, as a last count to a complaint, a challenge to somebody who's a member of the civil service who may have been involved and say that person really is an inferior officer, and the whole thing comes crashing down. Thank you, counsel. Justice Barrett? So, Mr. Nielsen, I would have come away from federal law thinking that there were two exceptions to this rule, Humphrey's executor and Morrison v. Olson. But it seems to me, and this goes back to some of the questions that Justices Sotomayor and Kagan were pressing you on, it seems to me that you're kind of arguing for a third ground here, which is, well, let me take a look at what is the executive official really doing? Does this really seem like a lot of executive power, a little executive power, something that looks more like private power? It strikes me as a pretty hard task to administer. So could you say a little bit more about that? Sure. Significant, of course, is not my word. That's what the court used numerous times in the sale of law itself. So I look to sale of law to understand what the court means by significant. And I think sale of law makes plain that significant captures the liberty and accountability concerns that require plenary control. The court focused on two things, whether private citizens are being regulated and whether there is substantial policy discretion. Here, no one has talked about the point that the court said in sale of law that the FHFA does not regulate purely private actors. We're not talking about the same sort of coercive power of the state that the CFPB wields. Likewise, Congress has tightly reticulated what this agency can do. It's like an instruction manual. And with a forecast removal protection, it makes the president easy to control this thing so it doesn't slip its leash or the box doesn't stop at the president. The president has ample ability to control this type of agency. Thank you, Mr. Nielsen. A minute to wrap up, Mr. Nielsen. Thank you, Your Honor. I would like to return to the point that Justice Kavanaugh made about the parade of horribles or where does this end. The court is going to have to answer some very hard questions, including what is the constitutional basis for any of this? Is it the vesting clause? Well, if so, why doesn't the logic of that end all the way with the civil service? Is it the take care clause? If so, how could a provision that allows for removal for insubordination prevent the president from faithfully executing the law? Likewise, just how relaxed is standing in these cases? And more than that, how far is the court really willing to go without clear constitutional text to guide it? These are all hard questions that have significance far beyond this appeal. Thankfully, however, the court doesn't need to answer any of them because an action director doesn't have tenure to begin with. Thank you. Thank you, counsel. Mr. Thompson. Mr. Chief Justice, and may it please the court, the net worth sweep leaves Fannie and Freddie with no reasonable prospect of becoming adequately capitalized. And so long as it remains in place, the company's best case scenario is to operate with so little capital that under section 4617A3, FHFA could place them into receivership at any time. FHFA abandoned its conservatorship mission when it imposed the net worth sweep, and the claim that only FHFA may sue FHFA for nationalizing Fannie and Freddie is contrary to this court's decision in American power. Decades of precedent on the lenient zone of interest test and the strong presumption favoring judicial review of agency action. Congress enacted the APA to make judicial review widely available to anyone who is agreed within the meaning of a relevant statute, and shareholders are agreed by the net worth sweep. But even under ordinary principles of state corporation law, our claims may proceed because they are direct. There are two distinct injuries caused by the net worth sweep, one suffered by the companies, which cannot rebuild capital and return to a sound condition, and another suffered by private shareholders who were removed from the company's capital structures. To see this, consider a hypothetical Third Amendment that required the companies to pay their net worth to plaintiffs rather than treasury. That action would have injured the companies no less than the real Third Amendment, but it would not have visited an injury on plaintiffs. The net worth sweep needlessly dissipated the assets of the companies FHFA is charged with rehabilitating, and FHFA's sweeping claims to unlimited standard list discretion powerfully illustrate the framers' wisdom in refusing to vest executive authority in an unaccountable fourth branch of government. I welcome the court's questions. Thank you, counsel. Your claim, which you've described as the nationalization of the enterprises, is basically that the common shareholders or your clients were left out in the cold and their holdings rendered worthless. But I checked this morning and Fannie Mae was trading at $2.69 and Freddie Mac at $2.56, and your shares are not worthless. They're worth something, presumably largely based on judgments about what the future holds. So doesn't that render your nationalization rhetoric just that, rhetoric? No, Your Honor, in the sense of there's no scenario under the Third Amendment in which we will be able to recover any economic value. It's true that there's value in the shares, but that's attributable to two factors. Number one, this lawsuit, and number two, that there is an ongoing political discussion about what to do with these companies and maybe one day in the future the government will abandon the network suite. But right now it's in force and in effect and the companies have been nationalized. Well, putting aside the lawsuit answer, the future does seem to me to suggest that there is still value in your shares. Now, it may be a gamble on the future, but that has value in itself. And on the other side of that, we can't lose sight of the fact that this was the Third Amendment. This was a lifeline thrown to your clients, and that has to be worth something too. Well, Your Honor, so first of all, respectfully, I don't think the court should put aside the lawsuit. That's an important driver, obviously, in the value of the stock. But in terms of the lifeline, Your Honor, I would just point out that the network suite exposed that line of commitment to maximum vulnerability because the companies can never build up capital to absorb losses. So if there had not been a network suite, there would be $124 billion of capital on the balance sheet today standing between future losses and the line of commitment. The network suite took away that ability to rebuild capital and has exposed that lifeline to maximum vulnerability. Do you make a claim going forward about the payments, even if you accept the validity of what the acting director did? Yes, Your Honor, we do. Under 12 CFR 1237.12a and b, not a penny can be paid to the Treasury without the approval of the director. And since 2014, there's been a Senate-confirmed director with forecaused removal protection. And on JA-118, we're asking that all those future payments be enjoined. Well, so your theory is that even if an acting director approved the instrument under which payments are going to be made, that when those payments are made, if there's an unconstitutional director, that they are invalid? Well, we are challenging the regulatory action of the Senate-confirmed directors in approving these dividends. And, of course, there's 4512F, which handcuffs the president. And so that even if there's an acting director, the president can't put the person that he wants in there. He has to pick one of the three deputy directors who were, in turn, picked by the prior director. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Thomson, both the government and amicus point out that your complaint only notes or focuses on the adoption of Amendment 3, the Third Amendment. I admit that, obviously, your prayer for relief speaks in, and junctive relief, as you just noted. But would you spend a few minutes on that, as to how we read in continuing implementation of the amendment and future implementation of the amendment, when you only complain of the adoption of the amendment? Thank you, Your Honor. We do complain about the adoption, but we also note throughout the complaint the overpayments that were being made. We calculate those overpayments to be $124 billion, and each one of those overpayments was an implementation of the network suite. So that theme really runs throughout our complaint. We also complain about how, over time, the commitment itself has been exposed to vulnerability. And so the implementation issues are important, and that's one of the reasons on JA-118 why we ask for an injunction in the future, so that there aren't any more dividend payments to the Treasury at the expense of the private shareholders. Would it have affected your separation of powers argument if the President, together with the Director, a future or subsequent Director, and the Secretary of the Treasury fully endorsed Amendment 3, openly endorsed it, endorsed it in writing, in essence, if all three ratified what had been done with this amendment? Would it change your complaint at all? Well, certainly if it was done after the fact, it would still be unconstitutional. One of the things that's pernicious about this structure is it reduced the President, in the real world, to the cajoler-in-chief, where this was, as one of my friends on the other side said, it takes two to tango. And so this wasn't a reflection of what the President wanted. It was a reflection of what the President was able to negotiate. In your hypothetical, Justice Thomas, if they were all to have done that simultaneously on day one, that might have changed things. But the other thing to realize is if we were creating a but-for world, in which there was no for-cause removal protection, we'd have to go back to the beginning of the agency, at least to the beginning of the Obama administration, and see how the companies and the conservator were different in 2012 at the time of the sweep. The administration had ongoing fights with Mr. DeMarco. We put this in our red wreath at page 72 to calls for Mr. DeMarco to be fired, and the administration said, we don't have the authority to fire him. But how would we unscramble the egg here? How do we put the parties back into the position they were in prior to Amendment 3? Thank you, Your Honor. Our preferred remedy that we articulated to the Fifth Circuit Court of Appeals on Bonk is that the overpayments measured against the $18.9 billion of dividends that were being paid, that anything above that be treated as a pay-down of principle on the government's liquidation preference. And if you do the math, the government's been paid back in total plus 10% interest, and there's $29.5 billion left over. The Fifth Circuit Court of Appeals asked the parties to address three questions. They gave the government 100 pages between FHFA and Treasury to address it. It said, quote, in practical terms, what would setting aside the net worth sweep entail, and how would it affect other functions of the FHFA? And in response to our preferred remedy, the government and FHFA said precisely nothing. They did not object. They had no practical concerns that they gave voice to. Thank you. Justice Breyer? You said, well, this is really like a nationalization, and the government took the company, gave it to the Treasury, and our shares are near worthless. Well, why didn't you bring a takings claim? Your Honor, we have brought a takings claim, but that doesn't absolve this Court of, under the APA, of addressing our challenge to the lawfulness of the agency action, and there's no reason to think that. I didn't say it did. Yeah. But I was just thinking, if you brought a takings claim, and it seems like a takings claim, why should we stretch out of recognition, or stretch or try to draw lines unnecessarily, on the question of derivative actions? Well, I think it's painful. We're a derivative action of a conservator. In fact, if you go so far that the company's hurt, really hurt, and the shareholders are destroyed, bring a takings claim. But as long as there's a colorable claim, as long as there's a colorable defense, forget it. Apply ordinary derivative law. Well, Your Honor, two points. Number one, principles of constitutional avoidance would counsel in favor of not reading that Congress is having authorized nationalization. There's no reason to think Congress would have wanted to stick the taxpayers with a big tab for a takings verdict in the Court of Federal Claims. But also, if the Court were to apply traditional measures of derivative direct, we say we win. We would point to the Allegheny case. I see that. But you have a rather special company, which your shareholders bought into with knowledge, and that is a company that has a public, as well as more of a public aspect than ordinary. They are there, and both parts are relevant. And so even if this is at the border of derivative actions, shouldn't we interpret the derivative actions? Why not? To encompass what goes on here with a colorable argument that they did it for the benefit of the corporation. Well, again, Your Honor, constitutional avoidance, we don't think the Court should depart from its precedence in Allegheny to create a massive takings liability. If I have time for one more question, I don't know. On your APA claim, my cousin Joe, whom I love dearly, I give to him a piece of land, and I assign to him, though I can retain ownership, I assign to him all rights to bring any lawsuit, defend lawsuits. I have no rights left in respect to that land. I gave them all to Joe. And if Bill comes along and cuts the tree illegally, it's Joe who can sue, not me, right? And as long as that's so, why is the APA any different? Suppose it's the Forest Service that does something to that land. I assign all my rights to Joe. Joe can bring an APA claim. So I gave mine away. Well, Your Honor, if that's right, how is this any different? Well, because, Your Honor, here it would be Joe suing Joe, because they would have to sue themselves, and it's a succession clause, not a termination clause. Congress knew how to terminate claims. They did so in 4617B2Ki, where they terminated the claims in receivership, and they didn't do that here with the conservatorship. I'm thinking of the anti-injunction clause, you see. Or I'm thinking of both clauses. Look, Joe can't sue because I assigned to Joe. I mean, I can't sue because I gave all those rights to Joe. Now, is the APA any different if that's Joe's claim? It is different, Your Honor. If we look at the language of this statute, it doesn't say just all rights go. It says all with respect to the regulated entity and its assets, and that's been understood not to include direct claims, only the derivative claims, and not the derivative claims that would be terminated. Justice Alito? All right. Counsel, let me give you this hypothetical situation. A director is appointed, and upon appointment, the director and the president have a joint news conference, the president says, I know the statute says that you are removable only for cause, but that's unconstitutional. Under the Constitution, I can remove you at will, and I will proceed on that basis. And the director says, I agree, and I will conduct myself on that understanding. And, in fact, I will verify every single morning that you still want me in office and you don't, as a matter of whim, want me to leave. Would it follow that everything done thereafter by the director is void ab initio? Well, Your Honor, I think that would obviously mitigate the concerns over the president being the cajoler in chief and not having sufficient control over the agency. There would still be a residual concern that, well, the director might change his mind and then he's got this legal protection, and so there still might be some issues about accountability and liberty, but it certainly would be a much less problematic situation than what we have here. Well, I do think we have to answer that question in order to determine whether it follows that the identification of an unconstitutional restriction on removal necessarily means, because it is a structural defect, that everything done by that officer is void ab initio. Well, Your Honor, we do think that this qualifies under Weber for being a structural error for two reasons. Number one, there are interests beyond the outcome that is produced. There's the interest in accountability. And, also, it's hard to measure the effects. That's why this court, presumably, in seal of law and free enterprise, said plaintiffs don't have to create a but-for world. Federal courts aren't well suited to psychoanalyzing coordinate branches of government and what they would do in a hypothetical world. And so where it's hard to measure the effects, and that's particularly true here, where, again, it was a negotiation between a Republican appointee and the Obama administration, and they had had bitter disputes throughout the three years that Mr. DeMarco was there. Well, it is hard to measure the effects, but sometimes we have to do things that are hard. Suppose we were to agree with Mr. Nielsen that this can't be distinguished from the head of the Social Security Administration. Or suppose we were to overrule Humphrey's executor, as some members of the court have suggested. Do you think it would follow that everything ever done by a Social Security Administrator or everything ever done by the FCC or one of the other multi-member commissions was void ab initio? They would all be wiped off the books? Your Honor, as I understand it, in free enterprise, the court left open the question of, if it's a lower-level employee who made the determination at the Social Security Administration, whether that would have to be voided. But certainly, yes, our position is everything done by the principal officers of those agencies would be void. Of course, there would be the statute of limitations in Article III that would limit what would have to be thrown out. And, of course, in Noel Canning, this court invalidated 20 months of the NLRB's activities. Well, do you think that if a provision of a massive statute is held to be unconstitutional, a person who is not in any way affected by that provision is entitled to relief? Well, if they suffered Article III injury at the hands of that person and it's a separation of powers case, I do think it should be void given the broad prophylactic protections that separation of powers protect. Thank you. Justice Sotomayor? I want to follow up a little bit on Justice Alito's questions. It does seem counterintuitive, perhaps illogical, to say that, assuming you're right, that the FHSA director must be removable at will, why you should get anything more than a declaratory judgment to that effect. First, the argument is that this decision was entered into by two entities under the complete control of the president. There is no dispute that the treasurer is removable at will. So we know what the president would have wanted because he had an agency he fully and unequivocally controlled entering this agreement. And then secondly, we have an acting director, which almost logically means that he could be removable entering it. Second, no president has ever tried to remove the director, acting or otherwise. So given those circumstances, I am not sure why structural, how this agreement or even how the at will termination affected you. Well, Your Honor. Why you're entitled to an unwinding of an agreement that was entered into, assuming, again, assuming we rule against you, that had a valid or a reasonable business reason for being entered into. Your Honor, respectfully, we don't know what the president wanted. We know the president was willing to sign this deal. Otherwise, the Secretary of Treasury wouldn't have signed it. But as my friends on the other side said, it took two to tango. This was a negotiation. And it was a negotiation with a Republican appointee with whom things, relationships had gotten so bad that on our red brief at page 72, we point out there was open calls for him to be fired. And the administration said he's an acting director and we can't fire him. And presumably that's because of 4511A that says it shall be an independent agency of the federal government. And under this interpretation that the acting director can be fired, it would toggle back from being a radically independent agency to a radically dependent agency. My friend on the other side points to the Swan case. But there that was the NCUA. And there were three board members. And the fact that one of them became dependent didn't transform the agency radically. Here when you have a single director and you say that the acting director can be fired at will, then you just radically transform the nature of it. In addition, even if I'm wrong about that, under 4512F, the president's hands are handcuffed in terms of whom he can designate. And we do challenge the actions of the regulator. So for all those reasons, we're entitled to relief. Certainly backward-looking relief was given in the Boucher case as well. You argue that the APA eliminates any need to look into whether a shareholder's injury is derivative of an injury suffered by the corporation. Do I take it that you're taking the position that anyone holding a single share in a company can challenge any agency action or rulemaking that affects the company's stock price? That would be seen to me as a sea change in how administrative law challenges are litigated. Your Honor, this was a concern that the American power dissent articulated. And 75 years later, it hasn't come to fruition. And I think because of cases like Air Courier, there you have the Postal Service with a monopoly on international air routes. The employees came forward when that monopoly was lost and said, that's going to hurt us economically. And the court said, these employees aren't within the zone of interest. But HERA is different because it's highly protective of shareholders' rights. We see that in the rehabilitative mission of the conservator. We see that in receivership where there's a priority scheme as to how the money can be distributed. And we see that in the preserve and conserve mandate. And we see that in 4617B11E, which requires the conservator to maximize the net present value of asset sales. That protects shareholders more than anyone because they're at the bottom of the waterfall. Justice Kagan? Mr. Thompson, let's go back to Justice Alito's question about the Social Security Administration. I'll put some scary-sounding numbers on this. The SSA has been led by a single commissioner since 1994. And ever since then, it's rendered 650,000 decisions every year. So that's about 17 million decisions. Now, you told Justice Alito, well, maybe there's some exception for lower-level employees. I'm not sure that AOJs would qualify as that. And even if they do, let's assume, which I think is probably true, that all of those decisions are rendered pursuant to guidance and rules that the SSA commissioner has enforced. So are we really going to avoid all of those decisions? Well, Your Honor, a few points. Number one, there's the statute of limitations and the Article III limitations. There's also the fact that the SSA is different than the FHFA. We don't think it makes a constitutional difference, but it has much more limited jurisdiction. It's not running multi-trillion-dollar companies. And so to the extent that the court wants to try to preserve the Social Security Administration, it could potentially try to do that. We don't think it should. We agree with the Solicitor General that it's unconstitutional and that, yes, its actions within the statute of limitations should be void if done by principle law. Isn't it a little bit odd? Because, I mean, none of us really think that any of those decisions would be different if there were a different level of presidential supervision, do we? Well, Your Honor, I think that's right. That was Lucia. In fact, as I recall, it was precisely because it wasn't thought that they would be different that a new ALJ was assigned on remand. No, I mean, I think Lucia is a different question. It's an appointments clause question. We can come back to that. Are you really making a good-faith argument that if there were at-will removal of the Social Security Administration that these 17 million decisions would come out differently, or indeed that any of them would? Your Honor, I understand and highly likely that they would not. But the same was true when Stern and Marshall. It was very unlikely that the bankruptcy judge, if he had had Article III protection, would have come out a different way on that state law counterclaim. And yet, still, relief was provided. And, likewise, in SELA law, it was very unlikely that if the President was able to fire the head of the CFPB that that subpoena to that law firm would have come out any differently. So that's sort of a feature. In a case like this, Mr. Thompson, where we're trying to figure out the proper remedy, I mean, it's a kind of equitable question, isn't it? And we're trying to figure out what position you would have been in absent a constitutional violation. Why isn't that the right question? Well, I think footnote 12 of free enterprise and SELA law just last term rejected that. They said plaintiffs don't have to try to recreate a but-for world. And here it shows why. We'd have to go back to 2009 and see what would have happened if Director Watt, for example, had been there throughout the entire time. And, you know, would the President have preferred to keep the money at Fannie and Freddie and spend it on affordable housing rather than send it all to the Republican-controlled House of Representatives and the Treasury? Does that mean, Mr. Thompson, that we have to do a great deal more than invalidate the Third Amendment and everything that's followed from it? I mean, why shouldn't we go back to the first or the second? Well, Your Honor, we focused on the Third Amendment because that's the feature of this that rearranged the capital structure. But as we made clear to the Fifth Circuit Court of Appeals, we are perfectly content with all of these arrangements, which, as we say in the complaint, were a concrete life preserver. It's like getting a credit card with a double-digit interest rate that you can't repay the debt on. It's not debt, but you can't pay the money back. And so we would be perfectly content with it being thrown out. Justice Gorsuch? Counselor, your remedial ask is a big one and hard for us to swallow, I know. And I want to focus on a couple aspects of it that are particularly important. The first is that once we had a new director in 2014, we've heard a suggestion that you haven't complained about actions taken after 2014 in your complaint. And the only complaint has to do with the entry into the Third Amendment, which took place during the pendency of a prior director. I'd like to understand your thoughts about that first. And second, whether a new constitutionally correct director that we ordained today could ratify the actions of an unconstitutional arrangement previously. Why would it have to be void? Yes, Your Honor. So on the first question, we do complain about the implementation. We are complaining about each and every one of the decisions under the network sweep by the director. Every one of these dividend payments gets declared quarterly. And none of them can be paid to the Treasury under 12 CFR 1237.12 A and B unless the director blesses those. And so we've complained in the complaint that but for each and every one of those payments, there would be $124 billion of extra capital at the companies. Obviously, the implication of that calculation in our complaint is we're not satisfied that any of these payments were made. Now, as for the court's second question with respect to ratification, we don't believe this could be ratified in large part because if the government is coming in and trying to justify this by saying, well, there was a death spiral. We didn't know the companies were going to do so well. Well, now we know. We know that they're thriving in terms of their profitability, not soundness because all the money is being siphoned off to Treasury. But we don't believe it could be ratified now, Your Honor. I guess I don't understand that latter answer. A lot of facts in there, but what legally, what constitutionally would prohibit the ratification? Well, when the underlying rationale that the government has proffered is now eight years later, been totally exposed to have no validity, then we don't see how the government could sort of time travel back and nunk pro tung plus that. I guess I'm asking why not? I mean, I understand that the Federal Vacancy Reform Act says that can't be done when its terms apply. But why couldn't we as some sort of equitable remedial dodge do that here? Well, I think the plain language of the APA, which says that the unlawful action shall be set aside, of course, would do account being taken for the rule of prejudicial error. But as we've talked about earlier today, this is structural error, not harmless error. That really wasn't my question. Okay. I'm sorry. It's fine. If you have any further thoughts about why it couldn't be ratified, I welcome them. But let me just pose you one last question. And that is the argument that, of course, the president could have fired the acting director because the Vacancy Act would normally apply, and that would permit him to do so. Well, at this point, the Vacancies Act did not apply because it had been more than 210 days since the Senate had rejected the nominee that President Obama had sent up. And so the FVRA just had no application at the time of the network sweep. Any reason why just that we shouldn't, as a background principle, assume that the president could?  Wiener said that you look at the nature of the function of the office that's vested in the officer. And I know some might think Wiener wasn't correctly decided as an original matter, but Congress is entitled to legislate against the backdrop of this court's precedents. And so the Wiener precedent said, here's how you can apply it. Look to the nature of the functions. It's identical, the powers of the acting director and the regular director. And we've got the plain language of 4511A, which says it shall be. Thank you. Justice Kavanaugh? Thank you, and good morning, Mr. Thompson. Picking up on the first part of Justice Gorsuch's questions, the Solicitor General in the reply brief on the remedies question starts with Marbury and says, Since Marbury, this court has continued to subject structural constitutional claims to the general law of remedies and said courts may deny relief on such claims as a result of estoppel, de facto officer doctrine, ratification, failure to make a timely objection, or the grant of a stay. And then says that you've cited other cases where the court has vacated actions taken by unconstitutionally structured agencies, but the Solicitor General says those cases show only that vacater is permissible in an appropriate case, not that it is mandatory in every case and that those principles I've just mentioned can apply. Your response to that? Well, number one, they haven't invoked, for example, the de facto officer doctrine. They haven't invoked that in this court, so they've waived that. The only thing that— Your reaction to the general catalog of principles outlined by the Solicitor General? I don't believe that it applies in a case brought under the APA. And then switching gears on some of the arguments made by the amicus, the forceful arguments made in distinguishing seal of law and other precedents, I want to get your reaction to a couple of those. The amicus points out that seal of law used the phrase significant executive power. Your response to that? Was that a descriptor, a descriptive language, or is that a necessary condition before we can say that a four-cause removal restriction on an executive law officer is unconstitutional? The amicus says the latter. We certainly did not understand this court to be creating a sliding scale, which would require lower courts to go and try to figure out how much is a significant executive of power versus not. So we did not understand it to be establishing a legally required standard. If it were, there's certainly significant executive authority being exercised. Sorry, can I stop you there? Another distinction that the amicus points out is that the four-cause language here is not the same. That's true, but Wiener tells us what the term four-cause means, and it says rectitude, which is moral failing. So it's different, but in some ways it's even a higher standard than what was before the court in seal of law. Moral failing is a smaller subset than neglect and malfeasance. And then the amicus says on a different front that the implications for other agencies could be significant, and that the court could not limit its holding here to single director independent agencies and leave those for another day, whether those follow or not would still be an open issue. Do you put your reaction to amicus's point that this would necessarily carry over into multi-member agencies, at least with chair designations and things like that? We disagree with that, Your Honor. We think we fall comfortably within the seal of law framework, and there would be no reason for the court to go back and redo that framework. So we disagree with it. Thank you. Justice Barrett? Mr. Thompson, I want to just make sure I understand the breadth of your argument for structural error. Let's assume that we think that the acting director was removable at will, there was no constitutional problem with the acting director. And let's further imagine that the acting director is the one who is in charge for, say, you know, up until six months ago, up until last year, and then we had a confirmed director. Does that mean that everything that happened in the course of the Third Amendment is then void, is structurally invalid because at some point a constitutionally invalid officer entered the scene? Well, Your Honor, if it was an acting director and all of our arguments are rejected about 4512F as well, and so that the court concludes there was no structural problem whatsoever at the agency until just six months ago, certainly we would complain about the last six months' worth of payments. But this is a – it's been many years that there's been a Senate-confirmed director. No, no, no, I understand that. I'm just trying to figure out how much participation by the unconstitutional officer matters. I mean, because here we didn't have constant, 100 percent of the time, control by a confirmed director. But you're arguing – I mean, and I'm saying let's assume that we think the acting director posed no problem. If the Third Amendment was entered into by the acting director with no constitutional problem, you're still saying that the participation of the confirmed director was a structural error that invalidated the Third Amendment and everything with it, correct? Well, certainly it affected the implementation, yes, Your Honor, that would invalidate any implementation by that illegal director, illegally constituted director. But only for those periods, so it wouldn't actually throw the whole thing out? It would just invalidate those actions taken by the confirmed director? I think that is a fair point, that the director can only be – their actions can be invalidated. The director's actions that he took could be invalidated but not his predecessor, if what his predecessor had done was totally permissible. And so we would then have to parse through and figure out what was done by the constitutionally problematic officer and what was fine because it was done by the acting director? Well, if – and again, it's a big if – if the court concludes there's no problem with 45-12-F, then the court would want to look to see what did the director do, and that stretches back to 2014, these approvals. And let me just – I just want to be certain that I understand what you're asking for. Are you asking us, say, if we agreed with you on the whole thing, do you want an injunction ordering Treasury to pay back the billions of dollars? No, Your Honor, so this is very important. We're seeking two things. Number one, we're seeking prospect of relief so that that, in your hypothetical, the Senate confirmed director would be enjoined from making any future sweep dividend – approving any future sweep dividend payments. And number two, we're asking to go back and have the overpayments over and above the $18.9 billion to be treated as a paydown of principle, and that would essentially deem the government payback. Thank you. A minute to wrap up, Mr. Thompson. Yes, Your Honor. For decades, federal conservators and receivers have exercised powers under statutory schemes that are indistinguishable from the one at issue here, yet no conservator or receiver has ever before been permitted to operate its ward for the exclusive benefit of the federal government. And so I will close with the words of Mark Calabria, FHFA's current director, quote, fair and predictably applied insolvency rules allow investors and creditors to judge the risks of investing in a company. If that process can be manipulated to favor one creditor, as FHFA has favored Treasury, then there is no basis to judge what could happen if a company fails. Given the important role that government bodies play in the resolution of many financial institutions, it is essential that the performance of this role assure all stakeholders of fairness and predictability. Close quote. We agree. Thank you. Thank you, counsel. Rebuttal, Mr. Mupan. So my colleague hasn't shown any presidential insulation on either side of the Third Amendment. With respect to the acting director, he hasn't shown any reason why this court would construe the statute to create a constitutional problem rather than to avoid one. The only point he really made was to say that once the acting director was removed by the president at will, the president had limited options for who could replace him. That's not a problem about presidential removal. It's not the claim they made, and it's actually not even correct because the FVRA is available. On the other side of the transaction, it's undisputed and indisputable that the Treasury Secretary signed the agreement and, of course, is removable at will by the president. His only argument on that side is to say, well, maybe the contract wouldn't have happened because of other things that happened earlier. But that can't be right either because on that theory, the agency could never act going forward. Think about, for example, the CFPB. On his theory, even though this court has said that the CFPB is now removable at will, the CFPB can take no further action going forward because someone could always walk into court and say, well, the circumstances would have been different if they hadn't been subject to a removal restriction in the past. That's not the way this court's judicial review works. The question is whether the agency action that's being challenged was insulated from the president, and here, because the Secretary of the Treasury and the acting director are the ones who entered into the Third Amendment, it was. So then if we assume the Third Amendment is valid as a constitutional matter, his fallback argument is to suggest, well, the implementation of the Third Amendment at least could be challenged. And the reason that doesn't work is because once the Third Amendment is valid, the money is owed. The only question is how the money is paid. Is it paid in cash or is it paid in liquidation? I point the court to JA 179 and 180, which says, to the extent not paid pursuant to Section 2A, dividends on these shares shall accrue and shall be added to the liquidation preference whether or not the funds legally available for the payment of such dividends and whether or not dividends are declared. A simple analogy to make the point, imagine a cabinet secretary entered into a contract to buy property that would pay for it for five years a million dollars a year, and then imagine two years in Congress imposed a removal restriction. No one would say that the last three years' worth of payments could be challenged. That money is owed as a legal matter under a valid contract, and there's no actual executive or discretionary decision being made in paying the money that's legally owed. Finally, on the anti-injunction clause, which we didn't have too much time to discuss this morning, I guess the key point I would try to make is that this wasn't a nationalization. It was a renegotiation of dividend obligation, and as all the courts of appeals before the court below recognized, and as Judge Strauss and Judge Bibas explained, the court shouldn't second-guess that under the anti-injunction clause. Thank you, counsel. Mr. Nielsen, this court appointed you to brief and argue the case as an amicus curiae in support of the position that the structure of the Federal Housing Finance Agency does not violate the separation of powers. You have ably discharged that responsibility, for which we are grateful. The case is submitted.